**TWIN BELL OIL SYNDICATE v. HELVERING, Commissioner of Internal Revenue.**

**HELVERING, Commissioner of Internal Revenue, v. TWIN BELL OIL SYNDICATE.**

**No. 7190.**

Circuit Court of Appeals, Ninth Circuit.

April 12, 1934.

Claude I. Parker, John B. Milliken, and George H. Koster, all of Los Angeles, Cal. (L. A. Luce, of Washington, D. C., of counsel), for taxpayer.

Sewall Key and Francis H. Horan, Sp. Assts. to Atty. Gen., for Commissioner.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

Petitions for review from a decision of the Board of Tax Appeals have been brought to this court by both the taxpayer and the Commissioner. The Board held that there were income tax deficiencies for the years 1925, 1926, and 1927 in the amounts of $52,-835.31, $9,194.63, and $2,631.60, respectively. 26 B. T. A. 172.

On May 3, 1929, the Commissioner notified the taxpayer that he had determined deficiencies in the latter's income tax for the years 1925, 1926, and 1927 in an aggregate amount of $68,451.77. From this determination the taxpayer appealed to the Board, which on May 25, 1932, promulgated its findings of fact and opinion, and on September 3, 1932, entered its decision. By agreement between the parties, the record in both petitions for review was consolidated in one transcript.

The taxpayer was organized under a declaration of trust executed on February 11, 1922, to take over the lease to certain oil properties for the purpose of developing them, to secure the proceeds from the disposition of any oil and gas produced therefrom, and to distribute the proceeds to the beneficiaries.

Under the declaration of trust, the trustees took title to the lease through an assignment to them from Thomas H. Lipps. The original declaration of trust of February 11, 1922, was amended on April 25, 1922, and subsequently a second amended declaration of trust was executed on March 14, 1925.

The amendment of March 14, 1925, made the following changes: The minimum number of trustees was made three, and the maximum five. Such salaries or compensation to the officers or trustees as might be agreed upon by unanimous consent of all the trustees were authorized. In 1925 and thereafter, the trustees voted themselves salaries. Paragraph 12 was amended by substituting "may" for "shall," so that the first sentence thereof reads: "The trustees may call meetings of the unit holders annually. * * *" A paragraph designated "Seventeenth-A" was added, which allowed the trustees to amend the trust by any resolution, minute, or motion passed by unanimous vote of all the trustees, without further formality, "the intent of this paragraph being to permit the trustees by unanimous vote to make such changes from time to time in the Declaration of Trust and the various Amended Declarations of Trust as the conditions of the trust estate may be to [sic] them deemed advisable without the necessity of executing any additional instruments or documents." Paragraph 18 was so amended as to permit in effect the purchase of additional property and sales by the trustees, but such acts could be done only by unanimous consent of all of the trustees at a meeting called for that purpose.

The essential characteristics of the organization as it existed under the three declarations of trust were not materially different, in so far as they affected the nature of the syndicate for the purpose of income tax. The purpose of the amended declaration of April 25, 1922, however, was to strengthen the trust provisions that the trustees should have exclusive management and control of the trust property. It is not necessary for us to detail those provisions, since the Commissioner concedes in his brief that "the trustees kept the books, negotiated all contracts, and were never subject to the supervision or control of the unit holders."

Certificates of beneficial interest, which were transferable on the books of the trust, were issued to persons who, by the contribution of a price of at least $100 for each unit, became beneficiaries or unit holders under the trust. All the certificates bore the stamp that they were subject to the provisions of the declarations of trust dated February 11, 1922, April 25, 1922, and—as to certificates issued after the second amended declaration of trust —March 14, 1925. No units were issued prior to April 25, 1922.

As amended on April 25, 1922, the trust instrument empowered the trustees to drill wells, develop them, deal in petroleum, and "hold or convey, grant, bargain, sell, lease for terms, repair and make any improvements thereon * * * subject to this trust as they may deem advisable." They might use a common seal. Neither trustees nor unit holders were to be held personally liable for debts of the trust, and creditors were to "look only to the funds or property of the trust for payment." No assessment should ever be made upon the unit holders. Any vacancy among the trustees was to be filled by those remaining. The trustees could declare quarterly "dividends." Meetings of the trustees were to be held on the call of the president or of any three of the trustees. The death of a unit holder or trustee should not operate to terminate the trust, but his executors or other representatives were to succeed to his rights. The trustees might by unanimous consent amend or alter the declaration of trust. The trust was to run for 50 years, and might then or at any time prior thereto be terminated by unanimous consent of the trustees.

Paragraph 18 of the declaration of trust provided: "None of the powers in this Declaration of Trust set out shall be construed as authorizing the trustees to acquire any properties or oil leases, or to dispose of the whole or any part of the capital or assets or other properties of this trust either in whole or in part, it being the specific intention of this paragraph to limit the powers of the trustees to the management and control of the property now owned, and controlled by the Syndicate, including the proceeds to be derived from the discovery and development of oil on the premises owned or controlled by the Syndicate, and to compel the trustees to make quarterly distribution of the entire net proceeds amongst unit holders of record as in Paragraph Ninth of this Declaration of Trust set forth."

The certificates referred to the syndicate as a "company," and were to be signed by the "President of the Board."

All three declarations of trust contained specific provisions for the annual election of officers by the trustees from among their own number. The officers were president, vice president, treasurer, and secretary, and all were to be removable at the trustees' pleasure.

"In actual practice," says the taxpayer in its brief, "the trustees exercised exclusive and complete control and management of the trust property. They kept the records of the trust; they determined the policies with respect to declaration of dividends; they fixed the amounts of reserve to provide for contingent liabilities; they negotiated and executed the contracts for the disposal of oil and gas produced from the trust property and, in general, conducted all of the affairs of the trust whatsoever they might be."

The foregoing excerpts from the various declarations of trust, together with the taxpayer's own picture of the organization in action, would seem to bear out the Board's finding that, "aside from the exclusive control resident in the trustees, petitioner's [taxpayer's] organization resembles in purpose and in form that of a corporation."

The Commissioner classified the taxpayer as an association taxable as a corporation.

The original oil lease, from W. O. Batson, which was finally assigned to the taxpayer and which is the trust property, contained the provision that "the Lessee shall pay as rental or royalty for the use of said land one sixth ($\frac{1}{6}$) of all oil produced and saved therefrom, said payment to be made in money or in kind at the Lessor's option."

On February 10, 1922, this lease was assigned by F. A. Andrews to Thomas H. Lipps. The agreement of assignment contained the provision that, in addition to the payment of the one-sixth royalty specified in the original lease, the assignee would pay a one-twelfth royalty to the assignor. On April 25, 1922, Lipps assigned all his rights under the lease to the taxpayer's trustees.

The one-sixth royalty paid to Batson and the one-twelfth royalty paid to Andrews, by the taxpayer herein, during the taxable years, were as follows:

| Year | Batson Royalties | Andrews Royalties |
|------|------------------|-------------------|
| 1925 | $159,853.20 | $79,926.60 |
| 1926 | 143,253.02 | 71,626.51 |
| 1927 | 70,946.34 | 35,473.17 |

The parties herein stipulated as follows: "* * * The respondent [Commissioner] has for purposes of computing the 27½ per cent. depletion allowance to which petitioner [taxpayer] is entitled, reduced petitioner's gross income for each of the years 1925, 1926, and 1927 by the respective amounts of the above mentioned royalties. Should the Board determine that petitioner's gross income should be reduced by the sum aforesaid in computing its depletion allowance then the amount of depletion allowed by the respondent is correct. Should the Board determine that petitioner's gross income should not be reduced by said royalties in computing its

depletion allowance, then said sums shall be added to the petitioner's gross income as determined by the respondent, for the purpose of determining the depletion allowance of $27\frac{1}{2}$ per cent."

This $27\frac{1}{2}$ per cent. allowance will, in its proper place, be hereafter discussed.

The taxpayer has never acquired any property other than the lease assigned to it by Lipps, and has never sold any part of such lease. The taxpayer had a contract under which it sold all the oil produced, to the Associated Oil Company, and was under contract with the Norwalk Gas Company to sell to it all the gas produced. The taxpayer entered on its books the payments received from the purchase of its oil in an "Oil Runs Account," and charged against such account the royalties to Batson and Andrews.

Two oil wells were drilled on the taxpayer's holdings in 1922, under "turnkey" contracts with the Keck Drilling Corporation, for a fixed sum. The two wells were deepened in 1923, also under contracts. As of December 31, 1926, the total well costs of the taxpayer were $391,922.88. No further well costs were incurred during the years involved in the instant case.

The amounts paid to the contractors under the "turnkey jobs" were charged on the taxpayer's books as "Well Cost, No. 1 Well," and "Well Cost, No. 2 Well." The amounts paid to the contractors for drilling the wells included the total cost of the wells, and nowhere on the taxpayer's books was there any segregation made for the portion of the cost which represented materials going into the wells and the portion which represented labor and fuel incidental to the drilling.

The Commissioner, in the determination of the deficiencies here in question, allocated 40 per cent. of the total cost of the wells to tangible equipment, cost, and allowed *depreciation* thereon. He determined that 60 per cent. of the cost of the wells represented intangible drilling costs, such as labor, wages, fuel, etc., and added such 60 per cent. of the well costs to the lease account returnable to the taxpayer through *depletion*. The Commissioner denied the taxpayer the right to take depreciation deductions with respect to 60 per cent. of the well costs.

The parties stipulated that, if the Board of Tax Appeals should determine that the taxpayer was not entitled to depreciation on the total well cost, then the Commissioner's determination of the taxpayer's liability in that respect was correct. But if the Board determined that the taxpayer was entitled to

charge the total well cost to its well account and be allowed depreciation thereon, it was stipulated that the taxpayer should be entitled to an additional depreciation deduction as follows:

1925 ................... $11,172.04
1926 ................... 8,953.04
1927 ................... 8,364.40

In 1926, some of the taxpayer's funds were used to purchase Julian Petroleum stock, which was sold in the same year at a profit.

The taxpayer's return for 1925 was filed on form 1041, a fiduciary trust form, and its returns for 1926 and 1927 were filed on form 1120, corporation income tax return. On the corporation returns, the kind of business was stated to be "Oil Producers."

In its opinion, the Board of Tax Appeals held that:

(1) The taxpayer was an association and was taxable as a corporation for the years 1925, 1926, and 1927.

2. The reasonable allowance for depletion authorized as a deduction under the Revenue Act of 1926, in the case of oil and gas wells, is required to be equitably apportioned between lessor and lessee. The basis for determining such reasonable allowance, prescribed in section 204 (c) (2) of that act, 26 USCA. § 935 (c) (2), is $27\frac{1}{2}$ per cent. of gross income from the property, and such reasonable allowance so determined is required to be apportioned equitably between lessor and lessee. In other words, the Board approved the Commissioner's depletion allowance computed, as set forth in the stipulation already quoted, on the taxpayer's gross income *reduced*, for each of the years 1925, 1926, and 1927, by the amounts of royalties turned over to Batson and Andrews in each respective year.

(3) The total cost of oil wells drilled under "turnkey" contracts represents the cost of improvement subject to depreciation allowance.

By its petition for review, the taxpayer appeals from the first two holdings of the Board. The Commissioner appeals from the third.

We will consider the three propositions seriatim.

■ 1. Was the taxpayer, organized as a trust under a duly executed declaration of trust, taxable for income tax purposes as an association and therefore subject to taxation under the corporation tax rates?

The statute applicable to the above proposition is section 2 (a) (2) of the Revenue Act of 1926, 26 USCA § 1262 (a) (2), which reads as follows:

"When used in this title—

"The term 'corporation' includes associations, joint-stock companies, and insurance companies."

The Treasury regulations and the leading Supreme Court case interpreting the foregoing section were fully discussed by this court in Trust No. 5833, Security-First Nat. Bank v. Welch, 54 F.(2d) 323, 326, 327, certiorari denied 286 U. S. 544, 52 S. Ct. 496, 76 L. Ed. 1281. For this reason, we are quoting somewhat extensively from that opinion, all the italics being supplied for the purpose of the present discussion. In that case, the court said:

"The problem to be solved in this litigation is whether or not the appellant is an association within the meaning of the act of Congress above referred to. Section 701 (a) (2) of the Revenue Act of 1928 (26 USCA § 2701 (a) (2). *This subdivision of the Revenue Act is a re-enactment without change of language used in the Revenue Acts of 1918, 1921, 1924 and 1926.* After the enactment of the Revenue Act of 1918, the Commissioner of Internal Revenue, acting under the authority and direction of said act requiring him to prescribe and publish all needful rules and regulations for the enforcement of the act, adopted articles 1502 and 1504, amended August 31, 1925, of regulation 65 pertaining to the Revenue Act of 1924, *articles 1502 to 1504 of regulation 60 [69] pertaining to the Revenue Act of 1926,* which are. identical with articles 1312 and 1314 adopted under the Revenue Act of 1928. In view of the adoption of these interpretative regulations by the Commissioner, Congress, in the adoption of the Revenue Act of 1928, must be deemed to have considered and adopted the interpretation placed upon the statute by the Commissioner of Internal Revenue, in a matter as indefinite as the definition of 'an association.' Upon this subject, the Supreme Court, in an opinion written by Justice Butler, in Brewster v. Gage, 280 U. S. 327, 50 S. Ct. 115, 117, 74 L. Ed. 457, stated:

" 'It is the settled rule that the practical interpretation of an ambiguous or doubtful statute that has been acted upon by officials charged with its administration will not be disturbed except for weighty reasons. [Many cases cited.] * * *

" 'The regulations promulgated under that section are substantially the same as the earlier regulations. Regulations 65, art. 1594; Regulations 69, art. 1594. The substantial re-enactment in later acts of the provision theretofore construed by the Department is persuasive evidence of legislative approval of the regulation. [Many cases cited.] The subsequent legislation confirmed and carried forward the policy evidenced by the earlier enactments as interpreted in the regulations promulgated under them.'

"The regulations referred to first adopted, in their present form, by the amendment of Regulation 65, August 31, 1925, are as follows:

" 'Art. 1312. Association. Associations and joint-stock companies include associations, common law trusts, and organizations by whatever name known, which act or do business in an organized capacity, whether created under and pursuant to state laws, agreements, declarations of trust, or otherwise, the net income of which, if any, is distributed or distributable among the shareholders on the basis of the capital stock which each holds, or, where there is no capital stock, on the basis of the proportionate share or capital which each has or has vested in the business or property of the organization. A corporation which has ceased to exist in contemplation of law but continues its business in quasi-corporate form is an association or corporation within the meaning of Section 701.

" 'Art. 1314. Association Distinguished from Trust. Where trustees merely hold property for the collection of the income and its distribution among the beneficiaries of the trust, and are not engaged. either by themselves or in connection with the beneficiaries, in the carrying on of any business, *and* the beneficiaries have no control over the trust, although their consent may be required for the filling of a vacancy among the trustees or for a modification of the terms of the trust, no association exists, and the trust and the beneficiaries thereof will be subject to tax as provided by Section 161–170 and by Articles 861–891. If, however, the beneficiaries have positive control over the trust, whether through the right periodically to elect trustees or otherwise, an association exists within the meaning of Section 701. *Even in the absence of any control by the beneficiaries, where the trustees are not restricted to the mere collection of funds and their payment to the beneficiaries, but are associated together with similar or greater powers than the directors in a corporation for the purpose of carrying on some business enterprise, the trust is an association within the meaning of the act.'*

"These regulations in the present form are said to be based upon the decision of the Supreme Court in Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 467, 68 L. Ed. 949 (1923) dealing with the Revenue Acts of 1916 and 1918. The court in that case said:

" 'We think that the word "association" as used in the Act clearly includes "Massachusetts Trusts" such as those herein involved, having quasi-corporate organizations under which they are engaged in carrying on business enterprises. What other form of "associations," if any, it includes, we need not, and do not, determine. * * *

" 'We conclude, therefore, that when the nature of the three trusts here involved is considered, as the petitioners are not merely trustees for collecting funds and paying them over, but are associated together in much the same manner as the directors in a corporation for the purpose of carrying on business enterprises, the trusts are to be deemed associations within the meaning of the act of 1918; this being true independently of the large measure of control exercised by the beneficiaries in the Hecht and Haymarket Cases, which much exceeds that exercised by the beneficiaries under the Wachusett Trust. We do not believe that it was intended that organizations of this character—described as "associations" by the Massachusetts statutes, and subject to duties and liabilities as such—should be exempt from the excise tax on the privilege of carrying on their business merely because such a slight measure of control may be vested in the beneficiaries *that they might be deemed strict trusts within the rule established by the Massachusetts courts.'* "

It is perhaps worthy of passing comment that the taxpayer, in its opening brief, ends its quotation of the last sentence of the foregoing paragraph with the word "beneficiaries," omitting the part thereof that we have italicized. The quotation with this omission is, we think, misleading; for it might be implied that the Supreme Court meant to say that, had the measure of control vested in the beneficiaries been *greater*—instead of being "such a slight measure"—the organization *would* have been *exempt* from taxation as a corporation. This, of course, is not the law, and the appellant itself contends that control by the beneficiaries is part of the "double test" in classifying an organization as an association. This, in turn, would indicate that the Supreme Court was being guided, in part at least, by the "control" rule, rather than by the "business" rule. But if we complete the sentence and supply the clause that

the taxpayer has omitted, the meaning of the court becomes clear; namely, that an organization will be taxed as a corporation, even if there is virtually *no* control by the beneficiaries, provided that it is engaged in a business enterprise.

Trust No. 5833 was followed by the Board of Tax Appeals in Trust No. 5522 and Trust No. 5644, etc., v. Commissioner, 27 B. T. A. 1250, decided April 26, 1933.

There is ample additional authority for the proposition that the "business" test is now paramount.

In Commissioner v. Atherton, 50 F.(2d) 740, 742, this court said: "The controlling feature of a trust is an association of individuals for administration of an estate for liquidation and equitable distribution, and the controlling distinction of an association is an association of individuals for administration of an estate for convenience and profit."

Other decisions by this court to the same effect are Willis v. Commissioner, 58 F.(2d) 121–123, and Sloan v. Commissioner, 63 F. (2d) 666, 669, 670.

The same rule has been followed in other Federal jurisdictions.

In Little Four Oil & Gas Co. v. Lewellyn (C. C. A. 3) 35 F.(2d) 149, 150, certiorari denied 280 U. S. 613, 50 S. Ct. 162; 74 L. Ed. 655, the court said: "The theory that the distinction between trusts of these classes and their consequent liability for taxes is based on the powers exercised by the shareholders —great or little—is no longer seriously regarded. The real test is whether the shareholders or trustees, or both combined, carry on business for profit, and, if they do, they constitute a business trust—in legal effect an association or a joint-stock company—with liability for taxes."

In connection with the expression "business trust" used in the foregoing excerpt, it might be observed in passing that, in the instant case, the transferable certificates, evidencing ownership of the "units," referred to the taxpayer as "a business trust."

Language similar to that used in the Lewellyn Case, supra, was employed in White v. Hornblower (C. C. A. 1) 27 F.(2d) 777, 778: "The taxability of the certificates depends on whether this trust constituted an 'association' under the Revenue Act. That it was a strict trust under Massachusetts law is too clear for discussion. But this is no longer the test of taxability as an 'association' under the federal statutes. The measure of control over the trust vested in the beneficiaries does not seem to be the determining factor, but

rather whether the trustees are conducting a business for profit or gain." See, also, Dunbar v. Commissioner (C. C. A. 1) 65 F.(2d) 447, 451.

Examining the facts of the instant case, already fully set forth, we conclude that the taxpayer engaged in business, and that it did so in a quasi corporate capacity. Furthermore, we believe that, in its dealings with the public, the syndicate conveyed the impression that it was a corporation. The use of the terms "dividends," "certificates," "officers," "company," and "Board," might easily lead a layman to assume that the entity was a corporate one. That this impression has actually been conveyed by the association may be inferred from the testimony of Lipps: "Occasionally we have to sign a contract where an official title is required and we use it."

In its brief, the taxpayer asserts that "Mr. Lipps explained that at times some people with whom they [the trustees] dealt or contracted would require the use by the trustee of some official title, and in order to be *agreeable,* the trustees decided to give themselves titles." (Italics our own.) It is not unlikely that this accommodating practice of the trustees occasionally led those with whom they dealt to believe that the "business trust" was indeed a corporation. Nor would the mere isolated statement, buried in a lengthy declaration of trust, that "a trust and not a partnership or corporation is hereby created," necessarily remove such impression. It is elementary that a legal designation adopted by the parties is not conclusive, if, as a matter of law, the terms of the entire instrument, and the acts of the parties thereunder, indicate that a different relationship actually resulted.

Applying the foregoing principles to the facts of the instant case, we are impelled to the conclusion that the taxpayer was engaged in business, that its organization was of a quasi corporate character, and that, as a consequence, it was an "association" and should be taxed as a corporation under the provisions of the Revenue Act of 1926 and the Treasury regulations promulgated thereunder.

2. We next address our attention to the second question presented by the taxpayer's petition for review; namely, "whether, in determining gross income for the purpose of applying the provisions of section 204 (c) (2), 26 USCA § 935 (c) (2), which provides for depletion based on 27½ per cent. of gross income, the taxpayer's actual gross income should be reduced by rentals and royalties paid."

The text of section 204 (c) (2) of the Revenue Act of 1926 is as follows: "In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."

Section 234 (a) (8) of the act, 26 USCA § 986 (a) (8), provides as follows:

"(a) In computing the net income of a corporation subject to the tax imposed by section 230 [section 981 of this title] there shall be allowed as deductions:

"(8) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the commissioner with the approval of the Secretary. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee."

Section 214 (a) (9) of the act, 26 USCA § 955 (a) (9), under the heading "Deductions Allowed Individuals," contains identical language, except that the word "deduction" instead of "deductions" is used in the last sentence.

According to the provision in section 204, supra, the 27½ per cent. is to be computed on "gross income." To determine what is "gross income," we must look to the statute itself:

"Sec. 213. For the purposes of this chapter, except as otherwise provided in section 233 [section 985]—

"(a) The term 'gross income' includes gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * *" 26 USCA § 954 (a).

Section 233, referred to as the exception

to the provisions of section 213, supra, reads as follows: "Sec. 233. (a) In the case of a corporation subject to the tax imposed by section 230 [section 981 of this title] the term 'gross income' means the gross income as defined in sections 213 and 217 [sections 954 and 958], except that mutual marine insurance companies shall include in gross income the gross premiums collected and received by them less amounts paid for reinsurance." 26 USCA § 985 (a).

Section 233 (b) of the act (26 USCA § 985 (b) refers to foreign corporations, and is not applicable here.

Section 217 of the act (26 USCA § 958), referred to in section 233 (a), supra, deals with "net income of nonresident alien individuals," and is not relevant to the present controversy.

Section 230 of the act (26 USCA § 981 note), also mentioned in section 233 (a), supra, treats of the rates of the tax to be levied upon the net income of every corporation, and is likewise not pertinent to the present discussion.

Section 232 of the act (26 USCA § 984), provides: "In the case of a corporation subject to the tax imposed by section 230 [section 981 of this title] the term 'net income' means the gross income as defined in section 233 [section 985] less the deductions allowed by sections 234 and 206 [sections 986 and 937], and the net income shall be computed," etc.

The pertinent portions of sections 233 and 234, referred to in section 232, have already been set out, supra. Section 206 of the act (26 USCA § 937) deals with "net losses," and does not apply here. We have omitted the portion of section 232 that does not have reference to the problem now before us.

From the foregoing, it would appear that "gross income" means that income from which all deductions are to be made, save only the irrelevant marine insurance deduction noted above. Therefore, it would further appear that the amounts paid out by the taxpayer as royalties were part of its gross income, within the meaning of the 27½ per cent. depletion provision of section 204 (c) (2).

This construction is borne out by the provisions of section 234:

"Sec. 234. (a) In computing the net income of a corporation subject to the tax imposed by section 230 [section 981 of this title] there shall be allowed as deductions:

"(1) * * * Rentals or other payments required to be made as a condition to the continued use or possession of property to which the corporation has not taken or is not taking title, or in which it has no equity." 26 USCA § 986 (a) (1).

Since rentals and similar payments are to be deducted in order to arrive at net income, it would seem to follow that such amounts, before they are deducted, form part of gross income. Almost identical language is used in section 214 (a) (1), of the act, 26 USCA § 955 (a) (1), which refers to "Deductions Allowed Individuals."

Therefore, from an examination of the various provisions of the act, the inference is strong that rentals and royalties were intended to form part of "gross income," and consequently should not be deducted therefrom in computing the 27½ per cent. allowance.

Let us next analyze section 204 (c) (2), supra, with reference to its context.

Section 204 (a) of the act, 26 USCA § 935 (a), reads as follows: "The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—" (Italics our own). Here follow eleven paragraphs, each containing the word "basis."

Subsection (b) of section 204 (26 USCA § 935 (b), deals with the "basis" for determining the gain or loss from the sale of property acquired before March 1, 1913.

Subsection (c) treats of the "basis" for allowing depletion, except that (1) in the case of mines, the basis shall be discovery value, etc. 26 USCA § 935 (c) (1).

Then we come to the subsection controlling here, section 204 (c) (2), supra, where for the first time the word "basis" is dropped, and, as we have seen, the word "allowance" only is used.

The language of section 204 (c) (2), as it appeared in the Revenue Act of 1926, was greatly different from that of the corresponding section in the Revenue Act of 1924 (see 26 USCA § 935, historical note, p. 41). The earlier section contained no special provision for oil and gas wells only.

From the foregoing, it may legitimately be inferred that Congress intended to substitute a fixed, arbitrary allowance for the loose "basis" of computation of the earlier statute.

Indeed, this inference would seem authorized by the language of the Supreme Court in United States v. Dakota-Montana Oil Co., 288 U. S. 459, 461, 466, 53 S. Ct. 435, 436, 77 L. Ed. 893:

410

"But the 'discovery value' provision was eliminated from the act of 1926, which is applicable here, and the taxpayer was permitted to calculate depletion on the basis of cost alone, section 204 (c), 26 USCA § 935 (c), or else to deduct *an arbitrary allowance, fixed by the statute, without reference to cost or discovery value, at 27½ per cent. of gross income from the well.* \* \* \*

"It was eliminated under the 1926 act, being no longer necessary, as the statute omitted the 'discovery value' provision and *substituted the arbitrary percentage allowance for depletion.*"

It may be regarded as significant that the Revenue Act of 1932 specifically provides for the exclusion of rents and royalties from gross income, here contended for by the Commissioner. Section 114 (b) (3) of the act, 26 USCA § 3114 (b) (3), reads as follows: *"Percentage depletion for oil and gas wells.* In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year, *excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.* Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph." (Italics our own.)

■ It will be observed that, with the exception of the provision for the exclusion of rents or royalties, the 1932 enactment is identical with the corresponding section of the Revenue Act of 1926, § 204 (c) (2), supra. This new qualifying phrase, not found in the act of 1926, amounts, it would seem, to a legislative interpretation of the act of 1926 as *not* excluding rents or royalties from gross income. It is at least a legislative recognition that the language used in the 1926 section was ambiguous. And, if ambiguity exists, it must be resolved in favor of the taxpayer.

In Hecht v. Malley, supra, at page 156 of 265 U. S., 44 S. Ct., 462, 466, the Supreme Court used the following language: "It is a new statute, supplanting and changing the former statutes in many respects, *and in which there is a significant change of phraseology,* incorporated in the general definition clause made applicable, expressly, to every provision of the Act."

So here, we believe that the "change of phraseology" in the 1932 act is "significant" of the legislative construction of the act of 1926.

■ In his brief, the Commissioner says: "The taxpayer is in effect, contending that it should be allowed 27½ per cent. of the whole income derived from the well, and that the lessor should also be allowed something for depletion, although there is no suggestion as to what amount this ought to be. If this were the proper view it would follow that in a situation where there was a lease, which is a common situation, the lessee could have the statutory limit of the deduction (27½ per cent.), and the lessor could also have an additional deduction."

But the Commissioner's argument is not one that should be addressed to the courts, but to the lawmaking body. Congress did, indeed, change the law, in 1932, so as to meet the Commissioner's objection. But that change had not yet been made in the statute that we are here considering, and we must take it as we find it.

That royalties paid out by a lessee should be included in his gross income was the precise holding of the court in Comar Oil Co. v. Burnet (C. C. A. 8) 64 F.(2d) 965, 967, 968, certiorari denied (October 9, 1933) 54 S. Ct. 69, 78 L. Ed. ——. There the court was construing section 213 (a) of the Revenue Act of 1921 (42 Stat. 237), defining "gross income" in language virtually identical to that of section 213 (a) of the Revenue Act of 1926, supra. In that case the court used the following language:

"It will be apparent upon examination of the statute (section 213 (a) that the term 'gross income' is broad in scope; broad enough to include, in the case of a lessor, rents or royalties paid to him by the lessee [cases cited]; *broad enough also to include, in the case of a lessee, rents or royalties paid by him to the lessor owner; and the practice has been to include them as gross income in the return.* [Cases cited.] \* \* \*

"It is one of the contentions of petitioner that these overriding royalties should be treated in the same manner as the original royalties. We think this contention is sound in so far as it results in the inclusion of both the original royalties and the overriding royalties in the category of 'gross income.'

"We are not insensible to the forceful argument of petitioner that neither original royalties nor overriding royalties should be included in gross income of the lessee, sublessee, or transferee. The argument is one, however, which we think should more proper-

ly be presented to the Congress than to the courts. The inclusion of royalties in the gross income of the lessee not only finds support in the language of sections 233 and 213 of the Revenue Act of 1921, but also in the actual practice as established during a considerable number of years."

█ We advance, finally, to the troublesome question of equitable apportionment, so earnestly insisted upon both by the Commissioner and by the Board.

As we have seen, this subject is covered by section 214 (a) (9) and section 234 (a) (8), supra.

In the first place, it is observable that both sections deal with "mines, other natural products, and timber," as well as with oil and gas wells. They are therefore, in a sense, general provisions. It is elementary that "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." Ginsberg & Sons v. Popkin, 285 U. S. 204, 208, 52 S. Ct .322, 323, 76 L. Ed. 704.

█ Secondly, the section specifies that the deduction, i. e., the "reasonable" deductions, *allowed by that paragraph,* shall be equitably apportioned. But that does not mean that the "arbitrary" deduction allowed by section 204 (c) (2) should likewise be "equitably" apportioned. Here again we are confronted by the rule that all doubtful intendments should be construed in favor of the taxpayer.

The Commissioner has not cited a single case in point, as sustaining his position. Night Hawk Leasing Co. v. Burnet, 61 App. D. C. 92, 57 F.(2d) 612, 613, dealt with a *mine,* and not an oil well. The depletion rule as to oil wells is, as we have seen, different from that applicable to mines. American Trust Co. v. Commissioner (C. C. A. 9) 31 F.(2d) 47, 48, had to do with the bad debt of a bank. Murphy Oil Co. v. Burnet, 287 U. S. 299, 306, 53 S. Ct. 161, 77 L. Ed. 318, is cited for the proposition that the Commissioner's method of computation was "reasonable." But the page cited deals with the reasonableness of the Commissioner's computation as to *bonus* payments *received by the lessor.* Royalties or bonuses *paid by the lessee,* as constituting the *lessee's* gross income, were not involved in that case. Furthermore, the controversy involved the Revenue Act of 1918. Similarly, Palmer v. Bender, 287 U. S. 551, 553, 53 S. Ct. 225, 77 L. Ed. 489, Burnet v. Harmel, 287 U. S. 103, 104, 112, 53 S. Ct. 74, 77 L. Ed. 199, and Bankers' Coal Co. v. Burnet, 287 U. S. 308–311, 53 S. Ct. 150, 77

L. Ed. 325, all treated of royalties or bonuses *received* and not *paid* by the taxpayer. Moreover, none of these cases involved section 204 (c) (2) of the Revenue Act of 1926. Signal Gasoline Corporation v. Commissioner (C. C. A. 9) 66 F.(2d) 886, 888–890, contained the following language, which at once reveals its relevancy to the instant case: "The question for determination is, Has petitioner such rights in the gas produced from the properties which amount to the necessary economic interest to entitle it to depletion under the law?" In the present litigation, there is no question that the taxpayer is entitled to depletion. The only problem is as to how that depletion is to be computed. There was no question of "equitable apportionment" involved in that case.

We are of the opinion that the holding of the Board of Tax Appeals as to this question should be reversed.

█ 3. We take up, finally, the question presented by the Commissioner's petition for review; namely, whether the taxpayer is entitled to a deduction for depreciation of its oil wells, drilled for the taxpayer under "turnkey" contracts, based on the total cost of the wells, or whether there should be eliminated from such basic cost that part of the total expenditure representing the drilling contractor's intangible drilling costs, such as wages, fuel, repairs, and hauling.

Section 214 (a) of the Revenue Act of 1926 provides:

"In computing net income there shall be allowed as deductions: * * *

"(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. * * *

"(9) In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the commissioner, with the approval of the Secretary. In the case of leases the deduction allowed by this paragraph shall be equitably apportioned between the lessor and lessee." 26 USCA § 955 (a) (8, 9).

Save for the omission of a sentence not material here, section 234 (a) (7) of the act, 26 USCA § 986 (a) (7), relating to corporations, is identical with section 214 (a) (8). Section 234 (a) (8) of the act, 26 USCA § 986 (a) (8), and section 214 (a) (9) are,

as we have seen, virtually identical. The former, however, relates to corporations.

Treasury Department Regulations 69, promulgated under the Revenue Act of 1926, contain the following articles:

"Article 223. *Charges to capital and to expense in the case of oil and gas wells.* Such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with the exploration of the property, drilling of wells, building of pipe lines, and development of the property may at the option of the taxpayer be deducted as a development expense or charged to capital account returnable through depletion. If in exercising this option the taxpayer charges these incidental expenses to capital account, in so far as such expense is represented by physical property it may be taken into account in determining a reasonable allowance for depreciation. * * * *"

"Article 225. *Depreciation of improvements in the case of oil and gas wells.* Both owners and lessees operating oil and/or gas properties will, in addition to and apart from the deduction allowable for depletion as hereinbefore provided, be permitted to deduct a reasonable allowance for depreciation of physical property, such as machinery, tools, equipment, pipes, etc., so far as not in conflict with the option exercised by the taxpayer under article 223. The amount deductible on this account shall be such an amount based upon its cost or other basis equitably distributed over its useful life as will bring such property to its true salvage value when no longer useful for the purpose for which such property was acquired. * * * *"

The instant case was decided by the Board on September 3, 1932. Since that time, the Supreme Court, in a series of decisions handed down on March 13, 1933, has held that expenditures for developing and drilling oil wells are returnable by the depletion allowance, and not by an additional allowance for depreciation.

In United States v. Dakota-Montana Oil Co., 288 U. S. 459, 462, 463, 467, 53 S. Ct. 435, 436, 77 L. Ed. 893, the respondent, in making its tax return of income derived from its operation of oil wells, claimed a deduction from gross income of a depreciation allowance on account of the capitalized costs of preliminary development and drilling. The Commissioner refused to allow the deduction claimed, ruling that it was for depletion, not depreciation, and was therefore included in the statutory depletion allowance of 27½ per cent. of the gross income, which the respondent had also deducted.

Construing the identical statutes and Treasury regulations that we are here considering, the Supreme Court said, after discussing article 223 of regulations 69, supra: "Article 225 [supra] limits the depreciation for which an allowance may be made to that of 'physical property, such as machinery, tools, equipment, pipes, etc.' We do not doubt that the effect of this language is to require the taxpayer to look to the depletion allowance, in this case 27½ per cent. of gross income, for a return of the costs of developing and drilling the well, which are involved here."

In the instant case, the taxpayer earnestly insists that its "completed oil well * * * represents an improvement on the property," and that it "is entitled, under articles 161 and 225 of Regulations 69, to deductions for depreciation of this improvement to return to him the most thereof." Article 161 provides in general terms for "a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade," etc., to be "for convenience" "referred to as depreciation."

Under similar—but, as we shall see presently, not identical—circumstances, the respondent in the Dakota-Montana Case made the same contention. The Supreme Court thus disposed of the argument:

"Respondent challenges the validity of the regulations thus applied as in conflict with section 234 (a) (8), 26 USCA § 986 (a) (8) [supra], which allows the deduction of a reasonable allowance 'for depreciation of improvements' in addition to the deduction for depletion. It is urged that the drill hole is an 'improvement' of the taxpayer's oil land, and that no logical distinction in accounting practice can be made between the cost of this improvement and the cost of buildings and machinery placed on the property for the operation of the well, for which depreciation should admittedly be allowed.

"The government argues that the well itself is not tangible physical property which wears out with use so as properly to be the subject of depreciation, and that in any event the regulations are based upon the practices of the oil industry, and are within the requirements of section 234 (a) (8) that a reasonable allowance for depletion and depreciation of improvements be made in all cases under rules and regulations to be prescribed by the Treasury Department.

"We do not stop to inquire whether, under correct accounting practice, an anticipated loss of a part of the capitalized cost of developing and drilling an oil well because of decreased utility of the well would be described or treated differently than wear and tear of the machinery used in production, or whether an allowance for the former serves a purpose logically distinguishable from one for the latter. For the issue before us, whether the statute requires the former to be treated as depletion, is resolved by the history of the legislation and the administrative practice under it."

After reviewing the legislative and administrative history referred to—a history identical, as we have seen, to the one that must guide us here—the Supreme Court concluded: "Respondent argues that whatever effect may be attributed to earlier re-enactments, that of 1926, which is applicable here, is without force because section 204 of that act abandoned discovery value as the basis of depletion and permitted the taxpayer to abandon cost and substitute a fixed allowance of 27½ per cent. of gross income from the well. We think the contention unfounded, and that, on the contrary, what was included in the reasonable allowance for depletion by the established construction of the earlier acts gave significant content to the word as used in the act of 1926. There is no ground for supposing that Congress, by providing a new method for computing the allowance for depletion, intended to break with the past and narrow the function of that allowance. The reasonable inference is that it did not, and that depletion includes under the 1926 act precisely what it included under the earlier acts. The regulations under the 1926 act so ruled, as has been shown, by continuing the provisions of earlier regulations under which costs of development and drilling were returnable by the depletion allowance and not by an additional allowance for depreciation."

See also Petroleum Exploration v. Burnet, 288 U. S. 467, 53 S. Ct. 439, 77 L. Ed. 898; Burnet v. A. T. Jergins Trust, 288 U. S. 508, 516, 53 S. Ct. 439, 77 L. Ed. 925; Pleasant v. Missouri-Kansas-Texas R. Co. (C. C. A. 10) 66 F.(2d) 842, 847.

The taxpayer herein, however, earnestly argues that the Supreme Court cases just referred to are not applicable to the instant case, inasmuch as those cases did not involve "turnkey" contracts, in which the owners or the lessees pay a specific contract price for their oil wells, which are turned over to them complete.

We cannot concur with the taxpayer's view, which would make a distinction between cases involving turnkey contracts and those cases in which the owners or the lessees drill their own wells. An oil well either is or is not a physical improvement or asset, upon the full value of which depreciation either should or should not be allowed. The essential character of an oil well cannot depend upon who drilled it. Steel is steel, and pipe is pipe, and labor is labor, no matter who contributes them.

The taxpayer relies chiefly upon three recent cases decided by circuit courts of appeal, in which there may be found language that, at first blush, might be understood as favorable to its contention. Analysis of each case, however, discloses that it is in reality no authority for the taxpayer's views.

In the case of J. K. Hughes Oil Co. v. Bass (C. C. A. 5) 62 F.(2d) 176, 177, 178, certiorari denied 289 U. S. 726, 53 S. Ct. 523, 77 L. Ed. 1475, the court seemed inclined to the view that we are here sustaining; namely, that, in principle, there is no difference between money expended for a completed well under a turnkey contract and that disbursed when the well is drilled by a contractor on a footage basis. There, however, the taxpayer subtracted the value of the physical properties making up the wells, from the total price paid for them, and deducted the difference as an expense. The Commissioner refused to allow the deduction, but treated the entire sums for the wells as capital expenditures, and made provision for their return to the taxpayer by allowing depletion deductions on the entire amount. Thus it will be seen that in that case the situation of the parties was not the same as that which prevails here; for there it was the *taxpayer* who contended that there was no difference between a turnkey contract and a footage contract, while the Commissioner refused, according to the taxpayer's statement on appeal, "to allow the plaintiff to deduct as an expense in computing its taxable income, intangible drilling and development cost incurred by it in developing an oil or gas lease owned by it, and force the plaintiff to recover these costs through annual depletion and depreciation deduction, solely because these costs were incurred under 'turnkey' drilling contracts, when the right to take the deduction would, under settled rules and decisions of the Treasury Department, have been allowed had the wells been drilled either with the plaintiff's own labor and machinery, or under the ordinary footage contracts."

414

The language there used by the court is significant:

"It is alleged that there is no reason in or basis for the distinction, for the purposes of capitalization, between moneys which an owner pays out when he drills a well himself, on his own property, with his own labor and equipment, or when a contractor drills it for him on a footage basis and the same amount of moneys representing the same amount of drilling and development costs paid out to a contractor as a part of the whole cost price of a turnkey job.

"If appellant claims no more than that the distinction is supported by no evident principle, that subjected to analysis moneys laid out in a completed improvement, such as an oil well, are no less and no more capital expenditures when it is furnished by a contractor on a footage basis than when it is done under a turnkey contract, *I think we could agree with him*. If, however, he means to claim that, because this is so, he is entitled to have his deduction allowed, we cannot. *The burden upon him to overcome the prima facies of the action of the Commissioner is not discharged* by a showing that the treatment he asks for is no more unreasonable or unjust than one which, under other circumstances, has been actually accorded him by the Commissioner.

"But this is not the whole of it. We are not concerned here with the question of whether the regulation invoked by analogy is reasonable or unreasonable. [Cases cited.] *We have here only the question whether appellant has sustained the burden of showing that the action of the Commissioner is unreasonable and invalid.*" (Italics our own.)

From the foregoing language, it is clear that the court there was controlled by the presumption in favor of the correctness of the Commissioner's determination, and not by the asserted distinction between turnkey contracts and other bases of oil well drilling. In the instant case, that very presumption of correctness is in favor of the view which is here maintained by the Commissioner, and which we are sustaining.

It is true that in the Hughes Oil Case, the court, in closing its opinion, supported, as "in accord with practice, principle, and authority," as well as because of the above presumption, the Commissioner's view "that a producing oil well is a physical property having a useful life beyond the taxable year, and that its acquisition for a price increases the invested capital of the purchaser to the extent of that price." But, as we have seen, this language was not necessary to the decision, which was based chiefly on the presumption of correctness attending the Commissioner's determination. Furthermore, the court cites no Supreme Court case in support of this statement. Indeed, the discussion by the highest tribunal, in the Dakota-Montana Case, supra, would indicate that the Supreme Court, by holding that "costs of development and drilling were returnable by the depletion allowance and not by an additional allowance for depreciation," disapproved of this "physical property" theory, as being opposed to "the history of the legislation and the administrative practice under it."

In the Hughes Oil Case, the court cited three decisions of Circuit Courts of Appeals, in support of this "physical property" theory. Two of them did not involve oil wells, which, as we have seen, have been regarded as sui generis both by Congress and by the Supreme Court, and the third, Dakota-Montana Oil Co. v. U. S. (Ct. Cl.) 59 F.(2d) 853, was reversed by the Supreme Court in the Dakota-Montana Oil Case, supra.

The second case cited by the taxpayer herein, in support of its contention that it is entitled to depreciation on the total cost of its oil wells, is Ramsey v. Commissioner (C. C. A. 10) 66 F.(2d) 316, 319, certiorari denied (October 16, 1933) 54 S. Ct. 91, 78 L. Ed. ——. There the Commissioner declined to permit a double deduction for the same costs, holding that, since the taxpayer had exercised his option to treat certain items as expenses and had taken credit therefor, he could not later retroactively elect to treat them as capital expenditures. Here, again, we are constrained to point out, by means of italics, important omissions in the taxpayer's quotation from the opinion, as contained in its reply brief: "Many cases are cited by counsel in which this particular regulation was involved. Only one deals with the validity of the regulation [Reg. 69, Art. 223, supra], Sterling Oil & Gas Co. v. Lucas (D. C. Ky.) 51 F.(2d) 413, in which Judge Dawson held it to be valid, and the Circuit Court of Appeals affirmed 62 F.(2d) 951, assuming, without deciding, its validity. * * * In Island Petroleum Co. v. Commissioner (C. C. A. 4) 57 F.(2d) 992, the court held the regulation not applicable, but its validity was recognized. Other cases involve 'turn-key' contracts, that is, where a contractor erects the derrick, drills and cases the well, and turns it over fully equipped. Hughes Oil Co. v. Bass (C. C. A. 5) 62 F.(2d) 176; Old Farmers Oil Co. v. Commissioner, 12 B. T. A. 203. The contract price of such a job, including recov-

erable equipment, was held not to be within the incidental costs covered by the regulation. These cases do not hold the regulation invalid; *they hold the taxpayer's proof did not call for its application.* It is not a question whether the well is drilled under contract; it is a question whether the labor costs have been segregated from the equipment expense. Other cases present the question, *not present here,* whether if such costs are capitalized, return thereof should be had through depreciation or depletion. [Many cases cited.]" We have italicized only the portions of the decision omitted by the taxpayer in its quotation that we deem are significant, as at once demonstrating that the Ramsey Case is not in point here.

The third decision cited by the taxpayer under this heading is State Consol. Oil Co. v. Commissioner (C. C. A. 9) 66 F.(2d) 648, 649, 650. There the expenditures were made in connection with oil well drilling operations under a contract by the terms of which the taxpayer was to drill wells on two lots belonging to the other party to the contract, and the proceeds resulting from any oil and gas discovered were to be applied, first, to reimbursing the taxpayer for its expenses in drilling, equipping, and operating the wells; second, to paying the landowner $1,400; and thereafter the petitioner was to receive a deed to a one-half interest in the property which was thenceforth to be jointly operated. We have before us here no such contract. As Judge Mack pointed out in the opinion in that case: "The expenditures in controversy were merely to be exchanged for a capital asset or to be recouped out of the land." The Commissioner there contended "that the Regulations were not intended to apply to one who drills a well upon land in performance of a contract to purchase an interest therein." The court concurred in that view, and, quoting the Hughes Oil Case, supra, adverted to "the burden upon petitioner * * * 'to overcome the prima facies of the action of the Commissioner,' " etc. The case is not in point here.

In the case of Graham-Loftus Oil Company v. Commissioner, 27 B. T. A. 1301, 1303, 1304, promulgated April 27, 1933, the taxpayer paid for the drilling of its oil wells on the turnkey contract system, and, as in the instant case, there appeared to have been no segregation on its books between the amounts paid for such incidental expenses as wages, fuel, repairs, hauling, etc., and the amounts paid for physical property, such as machinery, tools, equipment, pipes, etc., used in connection with the wells. There, as here, the Commissioner, in determining the deficiencies for each of the years involved, allocated 40 per cent. of the cost of drilling each of the wells as representing the cost of machinery, tools, equipment, pipe, etc., and allowed depreciation thereon at the rates claimed by the taxpayer. The remaining 60 per cent. of the drilling cost was allocated to intangible development costs to be added to the cost of the taxpayer's leases and recoverable through depletion allowances and not by way of depreciation. The Board there said:

"Petitioner has offered no evidence which would establish or tend to establish that this allocation made by respondent * * * was unreasonable and unfair.

"In the absence of such evidence we must hold respondent's determination in that respect correct. Petitioner does not contest the depreciation deductions which respondent allowed, but only those which he did not. As to these, respondent appears to have followed his regulations, which, as we have already pointed out, have recently received the approval of the Supreme Court in the cases which we have cited. [The Dakota-Montana Oil Co., Petroleum Exploration, and Jergins Trust Cases, supra.]"

The taxpayer asserts that in the Graham-Loftus Case, the Board of Tax Appeals "misinterpreted" the Supreme Court's decision in the Dakota-Montana Oil Case. We do not think so.

We therefore hold that the Board's decision, in so far as it was based on the holding that the taxpayer was an association and therefore taxable as a corporation, is affirmed; that, in so far as it rests on the holding that the Commissioner's computation of the 27½ per cent. depletion allowance was properly based on the taxpayer's gross income after the amounts of the royalties paid by the taxpayer had been deducted therefrom, it is reversed; and that, in so far as it is based on the holding that the entire cost of the wells drilled under turnkey contracts is subject to a depreciation allowance, it is reversed.

Affirmed in part, and reversed in part.